allocated to the Member based upon the Member's respective Percentage Interest at the close of such day.

(b) Authorized distributions of Company assets in respect of an Interest shall be made only to the Members who, according to the books and records of the Company, are the holders of record of the Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor any Member shall incur any liability for making distributions in accordance with the provisions of the preceding sentence, whether or not the Company or the Member has knowledge or notice of any transfer or purported transfer of ownership of an Interest which has not met the requirements of Article VIII of this Agreement. Notwithstanding any provision above to the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be allocated solely to the parties owning Interests as of the date such sale or other disposition occurs.

## ARTICLE VIII.

## RESTRICTIONS ON WITHDRAWAL AND TRANSFERS OF INTERESTS

Section 8.1   Withdrawal. No Member shall withdraw from the Company or otherwise voluntarily cause an Event of Dissociation as to that Member except upon the express written consent of all of the Members (including the Member whose Interest is at issue). Upon any such withdrawal or other voluntarily caused Event of Dissociation, the Member shall be an Assignee as to the Member's Interest, shall not be entitled to have the Member's Interest redeemed or to otherwise receive any distribution or other payment on account of the Member's withdrawal or other voluntarily caused Event of Dissociation. The Company may recover damages for breach of this Section 8.1 and may offset the Company's damages against any amount owed to a Member for distributions or otherwise.

Section 8.2   Basic Restrictions on Transfer. None of the Members' or Assignees' Interests (Units) or any portion thereof shall be the subject of a Transfer, unless the Member or Assignee has obtained the prior written approval of all of the Members (including the Member in whose Interest is at issue), which consent may be given, withheld, conditioned or delayed as such Members may determine in the their sole and absolute discretion; provided, however, that Louie R. Varney, Jr. may transfer any portion of his Interest (each a "Varney Transfer") to any member of his immediate family (whether during his life or through a testamentary bequest upon his death without the consent of any other Member. Any Transfer or purported Transfer not in compliance with this Article VIII shall be null and void.

Section 8.3   Further Restrictions on Transfer. In addition to the restrictions set forth in Section 8.2 of this Agreement, no Member or Assignee shall Transfer all or any part of the Member's or Assignee's Interest without registration under applicable federal and state securities laws, unless an exemption therefrom applies and, if requested by the Company, the Member or Assignee delivers an opinion of counsel satisfactory to the Company, that registration under any such laws is not required.

Section 8.4   Status of Transferee and Transferor. Any transferee or recipient of a Unit or Units subject to an effective Transfer from a Member shall be an Assignee and shall have no

Dec 05 07 04:54a   H S R Late Models   8103595985   p.15

right to (a) vote any Units or portion thereof subject to the Transfer or to otherwise participate in the management of the business or affairs of the Company, (b) become a Substitute Member or otherwise exercise any rights of a Member, or (c) have access to the Company records; unless all of the Members (including the Member whose Interest is at issue), in such Members' sole and absolute discretion, approve the admission of the Assignee as a Substitute Member and the Assignee executes documentation satisfactory to such Members accepting and adopting the terms of this Agreement; provided, however, that any recipient of a Varney Transfer made pursuant to Section 8.2 shall immediately be admitted as a Member of the Company. The transferor in a Transfer of the transferor's entire Interest to an Assignee shall thereafter cease to be a Member and shall not have any power to exercise any rights of a Member; provided, however, that such Member is not released from any unpaid contributions or other liability accruing prior to the date of the Transfer.

Section 8.5   Pledge of Interests. The pledge or granting of a security interest, lien or other encumbrance in or against all or any portion of a Member's Interest shall be a Transfer subject to the restrictions of this Article VIII.

ARTICLE IX.

DISSOCIATION OF A MEMBER

Section 9.1   Dissociation. A Person ceases to be a Member upon the occurrence of any of the following events (each an "Event of Dissociation"):

(a)   the Person withdraws from the Company, including any retirement or resignation from membership in the Company (as opposed to retirement or resignation merely from employment with the Company or any position as an officer or Manager of the Company);

(b)   an effective Transfer of the Person's entire Interest, whether or not the Assignee is admitted as a Substitute Member;

(c)   in the case of a Person who is an individual, the individual's death or adjudication by a court of competent jurisdiction of the individual's mental incompetency or insanity;

(d)   in the case of a Person who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust, but not merely the substitution of a new trustee;

(e)   in the case of a Person that is a partnership, limited partnership, limited liability partnership or limited liability company, the dissolution and commencement of winding up of the partnership, limited partnership, limited liability partnership or limited liability company;

(f)   in the case of a Person that is a corporation, the dissolution of the corporation;

LMS 00017

    (g)    in the case of a Person that is an estate, the distribution by the fiduciary of the estate's entire Interest in the Company; or

    (h)    Bankruptcy of the Person.

Section 9.2   Rights of Dissociating Member.   Upon an Event of Dissociation as to a Member:

    (a)    if the Event of Dissociation causes a dissolution and winding up of the Company under Article X of this Agreement, the Member shall be entitled to participate in the winding up of the Company to the same extent as any other Member, except that if the Event of Dissociation is a breach of this Agreement, any distributions to which the Member would have been entitled shall be reduced by any damages sustained by the Company as a result of the dissolution and winding up; and

    (b)    if the Event of Dissociation does not cause a dissolution and winding up of the Company under Article X of this Agreement, the Member shall not be entitled to any distribution solely by reason of the Member's dissociation, and thereafter shall only be entitled to participate as an Assignee in the Company. The Member shall not be entitled to a redemption of the Member's Interest or otherwise receive the value of the Member's Interest until such time, and in the manner, provided under Article X of this Agreement for the dissolution and winding up of the Company.

## ARTICLE X.

## DISSOLUTION AND WINDING UP

Section 10.1   Dissolution.   The Company shall be dissolved and its affairs wound up on the first of the following to occur:

    (a)    a determination by all of the Members that the Company shall be dissolved;

    (b)    at such earlier time as may be provided by applicable law.

Notwithstanding any other provision of this Agreement, the Members hereby agree that the business of the Company shall be continued upon the occurrence of an Event of Dissociation and that the Company shall not be dissolved upon the occurrence of an Event of Dissociation other than pursuant to the terms of this Section 10.1.

Section 10.2   Winding Up.   Upon dissolution, the Members and the Manager shall proceed to wind up and liquidate the business and affairs of the Company, and the Company may only carry on business that is appropriate to wind up and liquidate the business and affairs of the Company, including the following: (a) collecting the Company's assets, (b) disposing of properties that will not be distributed in kind to Members, (c) discharging or making provision for discharging liabilities, (d) distributing the remaining property among the Members, and (e) doing every other act necessary to wind up and liquidate the business and affairs of the Company. The Members shall follow the procedure for disposing of known claims set forth in

Ind. Code §23-18-9-8 and shall publish notice of the dissolution of the Company pursuant to Ind. Code §23-18-9-9.

<u>Section 10.3   Distribution of Assets</u>.  Upon the winding up of the Company, the assets shall be distributed as follows:

(a) to creditors, including Members who are creditors to the extent permitted by law, in the order of priority as provided by law to satisfy the liabilities of the Company whether by payment or by the establishment of adequate reserves, excluding liabilities for distributions to Members pursuant to <u>Article VII</u> of this Agreement;

(b) to Members to repay any loans to the Company or to satisfy any liabilities for distributions pursuant to <u>Article VII</u> of this Agreement which remain unpaid;

(c) to Members in accordance with the positive balances in their Capital Accounts after giving effect to all contributions, distributions and allocations for all periods.

## ARTICLE XI.

## INVESTMENT REPRESENTATIONS

By the execution of this Agreement each of the Members acknowledges, agrees, represents and warrants that:

(a) The Member understands that investment in the Member's Interest (Units) in the Company involves a high degree of risk and is suitable only for sophisticated investors.  The Member further understands that the Interests (Units) are being offered in reliance upon an exemption from registration provided by the Securities Act.

(b) The Member is purchasing the Member's Interest (Units) for the Member's own investment and not with a view to the distribution or resale thereof to any other Person.

(c) The Company has disclosed to the Member, in writing, and the Member acknowledges, that the transferability of the Interest (Units) is severely limited and that the Member must continue to bear the economic risk of this investment for an indefinite period as these securities have not been registered under the Securities Act or any state securities laws and therefore cannot be offered or sold unless they are subsequently registered under such acts or an exemption from such registration is available.

(d) The Member agrees that in addition to other prohibitions of and restrictions on transfer under this Agreement, the Member's Interest (Units) will not be sold without registration under the Securities Act and any applicable state securities law, or unless an exemption from such registration requirements applies and, if requested by the Company, until the Member has obtained an opinion of counsel satisfactory to the Company that such registration is not required in connection with any such transaction.

(e) The Member agrees that any certificates representing the Member's Interest (Units), if any, may contain the following legend: "The Units represented by this certificate were acquired for investment only and not for resale. They have not been registered under the Federal Securities Act of 1933, as amended, or any state securities law. These Units may not be sold, transferred, pledged, or hypothecated, except in accordance with the Operating Agreement of the Company and if first registered under such laws, or unless an exemption from such registration requirements apply, and if requested by the Company, the Company has received an opinion of counsel satisfactory to it that registration under such laws is not required." The Company may issue stop transfer instructions to its transfer agent (if any) or make a notation to such effect on its appropriate records.

(f) The Member has and has had access to all material facts with respect to the Interest (Units) by reason of active involvement in the organization and/or management of the Company.

(g) No commission or other remuneration shall be paid to any Person in connection with the offer or sale of the Interest (Units).

(h) The Member understands and agrees that the Member has no right to require the Company to register the Interest (Units) under federal or state securities laws at any time, or to join in any future registration.

(i) The Member agrees to hold the Company, Manager, Members and controlling persons (as defined in the Securities Act), and any persons affiliated with any of them or with the distribution of the Interest (Units), harmless from all expenses, liabilities, and damages (including reasonable attorneys' fees) deriving from a disposition of the Interest (Units) in a manner in violation of the Securities Act, or of any applicable state securities law or which may be suffered by reason of a breach of any of the covenants, representations and warranties contained in this Article XI.

## ARTICLE XII.

## AMENDMENTS

Section 12.1  Proposal of Amendments.  Amendments to the Articles and this Agreement may be proposed in writing by a Member.

Section 12.2  Approval of Amendments.  Any amendment to the Articles or this Agreement must be approved in writing by all of the Members.

## ARTICLE XIII.

## MISCELLANEOUS

Section 13.1  Complete Agreement.  This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members and the Company with respect to its subject matter. This Agreement and the Articles replace and supersede all prior agreements by and among the Members and the Company or any of them. This Agreement and

15

the Articles supersede all prior written and oral statements and no representation, statement, or condition or warranty not contained in this Agreement or the Articles will be binding on the Members and the Company or have any force or effect whatsoever.

Section 13.2   Governing Law.   This Agreement and the rights of the parties under this Agreement will be governed by, interpreted and enforced in accordance with the laws of the State of Indiana.

Section 13.3   Binding Effect; Conflicts.   Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding permitted upon and inure to the benefit of the Members, and their respective successors and assigns. This Agreement is subject to, and governed by, the Act and the Articles. In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the Act or the provisions of the Articles, the provisions of the Act or the Articles, as the case may be, will be controlling.

Section 13.4   Headings; Interpretation.   All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement. The singular shall include the plural, and the masculine gender shall include the feminine and neuter, and vice versa, as the context requires.

Section 13.5   Severability.   If any provision of this Agreement is held to be illegal, invalid, unreasonable or unenforceable under the present or future laws effective during the term of this Agreement, such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid, unreasonable, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, unreasonable, or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of such illegal, invalid, unreasonable or unenforceable provision, there will be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, unreasonable or unenforceable provision as may be possible and be legal, valid, reasonable and enforceable.

Section 13.6   Multiple Counterparts.   This Agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same instrument. However, in making proof with respect to this Agreement it will be necessary to produce only one copy hereof signed by the party to be charged.

Section 13.7   Additional Documents and Acts.   Each Member agrees to promptly execute and deliver to the Company such additional documents, statements of interest and holdings, designations, powers of attorney, and other instruments, and to perform such additional acts, as the Company may determine to be necessary, useful or appropriate to complete the organization of the Company, effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated by this Agreement, and to comply with all applicable laws, rules and regulations.

Section 13.8   No Third Party Beneficiary.   This Agreement is made solely and specifically among and for the benefit of the Members and their respective successors and assigns subject to the express provisions of this Agreement relating to successors and assigns. This Agreement is expressly not intended for the benefit of any creditor of the Company or any

other third party. No creditor or other third party will have any rights, interest, or claims under the Agreement or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

Section 13.9  Notices. Any notice to be given or to be served upon the Company or any Member in connection with this Agreement must be in writing and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member at the address specified in Exhibit A. Any Member or the Company may, at any time by giving five (5) days' prior written notice to the other Members and the Company, designate any other address in substitution of the foregoing address to which such notice will be given.

Section 13.10  Title to Company Property. Legal title to all property of the Company will be held and conveyed in the name of the Company.

Section 13.11  No Remedies Exclusive. To the extent any remedies are provided herein for a breach of this Agreement, the Articles or the Act, such remedies shall not be exclusive of any other remedies the aggrieved party may have, at law or in equity.

Section 13.12  Advice of Counsel. Each Person signing this Agreement:

(a) understands that this Agreement contains legally binding provisions;

(b) is advised, and has had the opportunity, to consult with that Person's own attorney; and

(c) has either consulted with the Person's own attorney or consciously decided not to consult with the Person's own attorney.

Section 13.13  Incorporated Schedules and Exhibits. The following Schedules and Exhibit are attached to and/or have been identified as the Schedules and Exhibit to this Agreement and are incorporated in this Agreement by reference as if fully set forth herein:

(a) Schedule I to the Operating Agreement (Schedule of Definitions);

(b) Schedule II to the Operating Agreement (Schedule of Limitations on Authority) and

(c) Exhibit A to the Operating Agreement. Names and Addresses of Members; Capital Contributions, and Units of Members

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first set forth above, to be effective on the Effective Date.

"MEMBERS"

*/s/ Louie R. Varney, Jr.*
Louie R. Varney, Jr.

AMERICAN SPEED ASSOCIATION, L.L.C., an Indiana limited liability company

By: */s/ Stephen M. Dale, Manager*
Stephen M. Dale, Manager

"COMPANY"

ASA LATE MODEL SERIES, LLC, an Indiana limited liability company

By: American Speed Association, L.L.C., its Manager

By: */s/ Stephen M. Dale, Manager*
Stephen M. Dale, Manager

LMS 00023

### Schedule I

### to the Operating Agreement of
### ASA LATE MODEL SERIES, LLC

### Schedule of Definitions

The terms used in this Agreement with their initial letters capitalized shall have, unless the context otherwise requires or unless otherwise expressly provided in this Agreement, the meanings specified in this Schedule I. Any term used but not defined in this Agreement shall have the meanings set forth in the Act. The singular shall include the plural, and the masculine gender shall include the feminine and neuter, and vice versa, as the context requires. When used in this Agreement, the following terms shall have the meanings set forth below:

"Act" means the Indiana Business Flexibility Act, as the same may be amended from time to time.

"Additional Member" means any individual or Entity admitted as a Member pursuant to Section 3.7 of this Agreement.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

Debit to such Capital Account the items described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be applied in a manner consistent with such intent.

"Agreement" means this Operating Agreement of ASA Late Model Series, LLC.

"Articles" has the meaning set forth in Article I of this Agreement.

"ASA" means American Speed Association, L.L.C., an Indiana limited liability company.

"Assignee" means any "assignee" as that term is used in Ind. Code § 23-18-6-3.1 and -4.1, and includes any transferee or recipient of a Transfer of any Unit or Units, or any portion thereof.

"Available Cash" means all cash funds of the Company on hand from time to time (other than cash funds obtained as contributions to the capital of the Company by the Members and cash funds obtained from loans to the Company) after payment or provision for (a) all operating

Schedule I-1

LMS 00024

expenses of the Company as of such time, (b) all outstanding and unpaid current obligations of the Company as of such time, and (c) a working capital reserve.

"Bankruptcy" means, and a Member shall be deemed a "Bankrupt Member" upon, (a) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in effect, (b) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, (c) the ordering of the winding up or liquidation of the Member's affairs, (d) the filing of a petition in any such involuntary bankruptcy case, which petition remains undismissed for a period of 180 days or which is not dismissed or suspended pursuant to Section 303 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy laws), (e) the commencement by the Member of a voluntary case under any applicable Debtor Relief Laws now or hereafter in effect, (f) the consent by the Member to the entry of an order for relief in an involuntary case under any such laws or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, or (g) the making by a Member of any general assignment for the benefit of its creditors.

"Capital Account" means the individual accounts established and maintained pursuant to Section 3.4(a) of this Agreement and in the manner provided by Treasury Regulation Section 1.704-(b)(2)(iv), as amended from time to time.

"Capital Contribution" means the total value of cash and agreed fair market value of property contributed and agreed to be contributed to the Company by each Member, as shown in Exhibit A, as the same may be amended from time to time. Any reference in this Agreement to the Capital Contribution of a current Member shall include a Capital Contribution previously made by any prior Member for the interest of such current Member, reduced by any distribution to such prior Member in return of "Capital Contribution" as contemplated in this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended. All references in this Agreement to sections of the Code shall include any corresponding provision or provisions of any succeeding law.

"Company" means ASA Late Model Series, LLC.

"Company Minimum Gain" has the meaning set forth in Treasury Regulation Sections 1.704-2(b)(2) and 1.704-2(d) with respect to "partnership minimum gain," substituting the word "member" for "partner" and "company" for "partnership" wherever they appear.

"Effective Date" has the meaning set forth in the preamble of this Agreement.

"Entity" means any association, corporation, general partnership, limited partnership, limited liability partnership, limited liability company, joint stock association, joint venture, firm, trust, business trust, cooperative, or foreign associations of like structure.

"Event of Dissociation" means any of the events listed in Section 9.1 of this Agreement upon which a Person ceases to be a Member.

"Interest" means the entire ownership interest of a Member in the Company at any particular time, including the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement and under the Act, together with the obligations of such Member to comply with all of the terms and provisions of this Agreement.

"Majority in Interest of the Members" means the Member(s) who hold a majority of the outstanding Units. "Majority in Interest of the remaining Members" means those Members holding a majority of the outstanding Units, excluding the Member in question and that Member's Units.

"Member" or "Members" refers to the parties to this Agreement as indicated in Exhibit A, and any Additional Members or Substitute Members.

"Member Nonrecourse Debt" has the meaning set forth in Treasury Regulation Section 1.704-2(b)(4) with respect to "partner nonrecourse debt," substituting the word "member" for "partner" and "company" for "partnership" wherever they appear.

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company. Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulation Section 1.704-2(i)(3).

"Member Nonrecourse Deductions" has the meaning set forth in Treasury Regulation Sections 1.704-2(i)(1) and 1.704-2(i)(2) with respect to "partner nonrecourse deductions," substituting the word "member" for "partner" and "company" for "partnership" wherever they appear.

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulation Section 1.704-2(b)(1).

"Nonrecourse Liability" has the meaning set forth in Treasury Regulation Section 1.7042(b)(3).

"Operating Agreement" means this Agreement.

"Percentage Interest" means the number of Units of a Member in relation to the total number of outstanding Units of all Members.

"Person" means an individual or an Entity.

"Principal Office" means the principal place of business as may be established pursuant to Section 2.2 of this Agreement.

"Securities Act" means the Federal Securities Act of 1933, as amended.

"Substitute Member" means any individual or entity admitted as a Member pursuant to Section 3.7 of this Agreement and Section 8.4 of this Agreement.

"Transfer" means any "assignment" as that term is used in Ind. Code § 23-18-6-3.1 and -4.1, and includes any gift, sale, exchange, assignment, conveyance, alienation or other transfer, whether voluntary or involuntary, and includes any Transfer to a receiver, bankruptcy trustee, judgment creditor, lienholder, holder of a security interest, pledge or other encumbrance, and Transfer upon judicial order or other legal process (such as a Transfer in connection with divorce proceedings).

"Unit" refers to a unit of measurement of a Member's Interest as established in Section 3.1 of this Agreement. Whenever reference is made to "Percentage Interest," a Unit may be converted into the same by dividing a Member's number of Units by the total of all Units outstanding.

**Schedule II**
**to the Operating Agreement of**
**ASA LATE MODEL SERIES, LLC**

**Schedule of Limitations on Authority**

Except as provided otherwise in this Agreement, the approval of all of the Members shall be required to approve any of the following actions:

(i) the (A) commencement of a voluntary case under any applicable bankruptcy, insolvency, reorganization or similar law now or hereafter in effect, (B) consent to the entry of any order for relief in an involuntary case under any such law, (C) consent to the appointment or taking possession by a receiver, liquidator, assignee, custodian, trustee or sequestrator (or similar official) of the Company or of any substantial art of the property thereof, (D) making by the Company of a general assignment for the benefit of creditors or (E) making of any other arrangement or composition with creditors generally to modify the terms of payment of or otherwise restructure their obligations;

(ii) any consolidation, merger, share exchange or amalgamation with, or the acquisition of any interest in, any other Person or its assets, other than acquisitions of goods and services in the ordinary course of business;

(iii) the voluntary liquidation, winding-up or dissolution of the Company;

(iv) any significant change in (A) the geographic locations of the traveling series sanctioned by the Company, (B) the late model crate motor or (C) the engine packages detailed in the 2004 rules for the ASA Late Model Series;

(v) any disbursement or payment to be made by the Company in excess of $25,000; or

(vi) any material modification, change or amendment to any agreement or arrangement which is the subject of the matters referred to in any provision of this Schedule II.

## Exhibit A

### to the Operating Agreement of
### ASA LATE MODEL SERIES, LLC

### Names and Addresses of Members; Capital
### Contributions; and Units of Members
### (As of December 12, 2003)

| Member | Initial Capital Contribution | Current Number Of Units |
|---|---|---|
| American Speed Association, L.L.C.<br>203 South Heritage Way<br>Pendleton, IN 46064 | $700 | 70 |
| Louie R. Varney, Jr.<br>[7360 Elm<br>Lexington, MI 48450] | $300 | 30 |

INDY 1264299v3

Exhibit A - 1

LMS 00029